**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHANNON FERENCZ, Administratrix** | ) | |
| **of the ESTATE OF CADE STEVENS**, | ) | Civil Action No. 2:11-cv-1130 |
| and | ) | |
| **SHANNON FERENCZ, individually,** | ) | **TYPE OF PLEADING**: |
| | ) | |
| Plaintiff, | ) | **SECOND AMENDED COMPLAINT** |
| | ) | |
| | ) | *Section 1983 Civil Rights Action* |
| | ) | |
| | ) | |
| | ) | |
| | ) | **FILED ON BEHALF OF**: |
| VS. | ) | Shannon Ferencz, Administratrix of |
| | ) | the Estate of Cade Stevens and |
| **LARRY MEDLOCK, WARDEN OF THE** | ) | Shannon Ferencz, Individually. |
| **FAYETTE COUNTY PRISON**, in both his | ) | |
| Official and Individual Capacities, **BRIAN** | ) | |
| **MILLER, DEPUTY WARDEN OF THE** | ) | |
| **FAYETTE COUNTY PRISON**, in both his Official | | |
| and Individual Capacities; **GEARY O'NEIL,** | ) | **COUNSEL OF RECORD:** |
| **BARRY SIMON, JOHN DOE #1, JOHN DOE #2,** | | |
| **JOHN DOE #3 and JOHN DOE #4** in their | ) | Noah Geary, Esquire |
| Official and Individual | ) | 225 Washington Trust Building |
| Capacities, **LOUIS KRAKOWSKI**, in his Official | ) | Washington, PA 15301 |
| and Individual Capacities, **FAYETTE COUNTY**, | ) | PA ID 78382 |
| Pennsylvania, **PRIMECARE MEDICAL, INC.,** | ) | |
| **CAROL YOUNKIN**, in her Official and Individual | ) | |
| Capacities, and **TIMMEE BURNSWORTH**, in her | ) | February 29, 2012 |
| Official and Individual Capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**JURY TRIAL DEMANDED.**

1

**SECOND AMENDED COMPLAINT.**

**AND NOW COME** the Plaintiffs, by and through their attorney, Noah Geary, pursuant **to Federal Rule of Civil Procedure 15(a)(1)(B),** Amending as a Matter of Course, and file this Second Amended Complaint, and in support avers as follows:

**THE PARTIES.**

1.      Plaintiff Shannon Ferencz is the Administratrix of the Estate of Cade Stevens, deceased. Letters of Administration were issued by the Register of Wills of the Fayette County Court of Common Pleas on September 18, 2009 appointing her as the personal representative of her son's Estate at docket number 2609-0724.

2.      Plaintiff Shannon Ferencz, individually, is the mother of Cade Stevens, deceased.

3.      Defendant Larry Medlock, in his Official Capacity, was at all times material acting under color of state law in his capacity as Warden of the Fayette County Prison, which is the County Jail in Fayette County, Pennsylvania and is located at 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

4.      Defendant Larry Medlock, individually, is an adult individual who at all times relevant acted as an individual and is a resident of Fayette County, Pennsylvania, located within the Western District.

5.      Defendant Brian Miller, in his Official Capacity, was at all times material acting under color of state law in his capacity as the Deputy Warden of the Fayette County Prison, which is the County Jail in Fayette County, Pennsylvania and is located at 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

2

6.      Defendant Brian Miller, individually, is an adult individual who at all times relevant acted as an individual and is a resident of Fayette County, Pennsylvania, located within the Western District.

7.      Defendant Geary O'Neil, in his official capacity, was at all times relevant acting under color of state law in his capacity as a Correctional Officer of the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

8.      Defendant Geary O'Neil, individually, is an adult individual who at all times relevant acted as an individual and is a resident of Fayette County, Pennsylvania, located within the Western District.

9.      Defendant Barry Simon, in his official capacity, was at all times relevant acting under color of law in his capacity as a Correctional Officer of the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

10.      Defendant Barry Simon, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

11.      Defendant John Doe #1, in his official capacity, was at all times relevant acting under color of law in his capacity as a Correctional Officer at the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

12.      Defendant  John Doe #1, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

13.     Defendant John Doe #2, in his official capacity at all times relevant was acting under color of law as a Correctional Officer at the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

14.     Defendant John Doe #2, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

15.     Defendant John Doe #3, in his official capacity at all times relevant was acting under color of law as a Correctional Officer of the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

16.     Defendant John Doe #3, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

17.     Defendant John Doe #4, in his official capacity at all times relevant was acting under color of law as a Correctional Officer of the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

18.     Defendant John Doe #4, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

19.     Defendant Louis Krakowski, in his official capacity at all times relevant was acting under color of law as a Counselor at the Fayette County Prison with an address of 61 East Main Street, Fayette County Courthouse, Uniontown, PA 15401.

20.     Defendant Louis Krakowski, individually, is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

21.     Defendant Fayette County is a political subdivision of the Commonwealth of Pennsylvania and is located in the Western District of Pennsylvania. At all times material, Fayette County was operating a county jail/prison system and was acting under color of state law.

22.     Defendant PrimeCare Medical Incorporated is a Corporation organized under the laws of the state of Pennsylvania with its principal place of business located at 3940 Locust Lane, Harrisburg, PA 17109.

23.     At all times material, Defendant PrimeCare Medical, Inc. was contracted by Fayette County to provide medical care to the inmates of the Fayette County Prison; as such, the actions and inactions of its employees, agents and servants were done on behalf of/as agents of Fayette County, and thus constituted state action.

24.     At all times material, Defendant Carol Younkin in her Official Capacity was acting on behalf of Defendant PrimeCare Medical, Inc. as its employee, agent and servant.

25.     Defendant Carol Younkin in her Individual Capacity is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

26.     At all times material, Defendant Timmee Burnsworth in her Official Capacity was acting on behalf of Defendant PrimeCare Medical, Inc. as its employee, agent and servant.

27.     Defendant Timmee Burnsworth in her Individual Capacity is an adult individual who at all times relevant acted as an individual and was a resident of Fayette County, Pennsylvania, located within the Western District.

28.     At all times material, other unknown employees of PrimeCare Medical, Inc. were acting on behalf of Defendant PrimeCare Medical, Inc. as their employees, agents and servants.

### JURISDICTION AND VENUE.

29.     This action arises under the Constitution of the United States of America, particularly the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and under the laws of the United States of America, particularly the Civil Rights Act Title 42, U.S.C.§ 1983.

30.     The jurisdiction of this court is invoked under the provisions of 28 U.S.C.A. § 1331. The Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. Section 1367(a) to hear and adjudicate state law claims.

31.     Venue is proper in this District pursuant to Title 28 U.S.C. § 1391 because the Defendant's unlawful acts giving rise to the claims occurred in this District.

### Statement of the Claim.

32.     The above paragraphs are incorporated herein as though set forth fully.

33.     On or about Thursday, September 10, 2009 Cade Stevens, age 25, was lodged in the Fayette County Prison. The Prison is the County Jail in Fayette County.

34.     The basis was the filing of criminal charges.

35.     Stevens, upon being lodged in the Fayette County Prison, had merely been charged with crimes and was presumed innocent. Accordingly, he was a pre-trial detainee and was thus

guaranteed the right under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution to proper medical care.

36.    The Prison staff, including all employees of Fayette County as well as all employees of Prime Care Medical, Inc. had a duty to provide for the care of all pre-trial detainees and inmates in the facility, including Stevens.

37.    "Care" means medical care, which includes both physical care and mental/psychological/psychiatric care.

38.    Upon Stevens being lodged in the jail, Prime Care Medical, Inc. employee Carol Younkin conducted a medical evaluation of Stevens. Stevens was diagnosed as going through drug withdrawal.

39.    The medical evaluation also included a mental health assessment of Stevens.

40.    The mental health assessment involved a point system.  Specifically, if Stevens scored 8 points or higher on the scale, pursuant to the Defendants' own inmate classification policy, Stevens was required to be classified as suicidal.

41.    Stevens scored a 12 on the point system, which required the Defendants to classify him as a suicidal.

42.    If classified as suicidal, Stevens was to immediately be placed on a documented suicide watch, wherein he was to be checked on every 15 minutes by Correctional Officers.

43.    After his medical evaluation, Stevens then was the subject of a meeting of the Prison Inmate Classification Committee. The purpose of the meeting was to discuss and review the information generated during Stevens' medical evaluation, and based upon that information, to appropriately classify Stevens.

44.     The Inmate Classification Committee consisted of 3 people: Prime Care Inc. employee

Carol Younkin and Fayette County employees Deputy Warden Brian Miller and Lou Krakowski.

45.     The jail's Inmate Classification Committee met and discussed how to classify Stevens. In

light of his scoring a 12 on the scale, the Committee was required to classify him as suicidal.

46.     Instead, the Committee did not classify Stevens as suicidal. This was despite the fact that

all three members of the Classification Committee knew that there was a strong, substantial and

excessive likelihood and risk of a suicide attempt in light of Stevens scoring a 12 on the

Defendants' own point system. Furthermore, none of the three members of the Classification

Committee communicated to Prime Care Medical, Inc. Staff or the Correctional Officers on B

Range who were ultimately responsible for monitoring Stevens what type of watch Stevens

should have been placed on, that he was suicidal, and going through drug withdrawal.

47.     Stevens was then lodged on B Range, Cell #1. He had no cell mate.

48.     PrimeCare Medical, Inc. employee Timmee Burnsworth, despite learning that Stevens

was suicidal and going through drug withdrawal, failed and/or delayed in assessing Stevens and

in giving Stevens medication for the drug withdrawal he was experiencing. Burnsworth also

failed to communicate to the Correctional Officers ultimately responsible for monitoring Stevens

on B Range what watch Stevens should have been on and that Stevens was both suicidal and

going through drug withdrawal.

49.     The Fayette County Prison was equipped with a video surveillance system, which was

working on the day in question.

50.     Despite the knowing, intentional and deliberate misclassification of Stevens as not suicidal, there happened to be a video camera in Stevens cell, which was fully operational and was working.

51.     The video surveillance of Stevens and what he was doing in his cell at all times was continuous and was broadcast throughout the Prison on 4 different television monitors, all of which were working and all of which were manned by Correctional Officers.

52.     The B Range work station was located just around the corner from Stevens's cell on the B Range, approximately 20 feet from Stevens' cell.

53.     Further, the B Range work station was equipped with a television monitor, 1 of the 4 monitors throughout the prison which showed continuously and at all times what Stevens was doing in his cell.

54.     The monitor at the B Range Station is situated on the wall above the desk at the work station so that when the Correctional Officer responsible for the care of the B Range inmates is sitting at his desk, facing his desk, the monitor is straight ahead, directly in front of the Correctional Officer.

55.     On the morning of Saturday, September 12, 2009, Defendant Correctional Officer Barry Simon was stationed at the B Range work station. Simon's shift that day was 7:30 a.m. to 3:30 p.m..

56.     At approximately 9:32 a.m., Stevens attempted suicide by trying to hang himself with his bedsheet from the top of the cell bars.

57.     This suicide attempt took several minutes.

58.     The attempt was unsuccessful. After the attempt, however, Stevens left the bedsheet hanging from the top of his cell bars. Stevens began to pace in his cell and was visibly in mental distress.

59.     This first suicide attempt was clearly viewable from the B Range work station television monitor as well as all 3 of the other monitors throughout the prison. Had even 1 of the 4 Correctional Officers who manned those stations, including Barry Simon, bothered to look at their television monitors, they would have seen the first suicide attempt.

60.     Secondly, after the first attempt, the hanging bedsheet from the top of Stevens' cell bars was clearly viewable on the monitors.  Had even 1 of the 4 Correctional Officers who manned those stations bothered to look at their television monitors – even for a moment - they would have seen the hanging bedsheet.

61.     A few minutes later, at approximately 9:37 a.m., Stevens attempted for a second time to commit suicide by hanging himself with his bedsheet from the top of his cell bars.

62.     This second suicide attempt took several minutes.

63.     This second suicide attempt was also clearly viewable from the B Range work station television monitor as well as all 3 of the other monitors throughout the prison. Had even 1 of the 4 Correctional Officers who manned those stations, including Barry Simon, bothered to look at their television monitors, they would have seen this second suicide attempt.

64.     This second attempt was unsuccessful. Stevens, however, once again left the bedsheet hanging from the top of his cell bars after the attempt. Again Stevens began to pace in his cell and was visibly in mental distress.

65.     The bedsheet remained hanging from the top of his cell bars and was clearly viewable on the monitor after the attempt, and would have been seen had any of the 4 Correctional Officers who were manning the 4 work stations with the television monitors bothered to actually look at their monitors.

66.     A few minutes later, at approximately 9:40 a.m., Stevens attempted for a third time to commit suicide by hanging himself with his bedsheet.

67.     This time Stevens hung from his bedsheet for 20 + minutes, without being noticed by any of the 4 Correctional Officers who were manning the 4 television monitors.

68.     In fact, Correctional Officer Geary O'Neill, who was stationed at the B Range work station, was asleep at his work station. O'Neil had just temporarily replaced Correctional Officer Barry Simon who had went on a break. O'Neill, immediately upon arriving at the B Range work station, pulled a chair up next to his desk, put his feet up, laid his head back, and commenced to taking a nap.

69.     Further, O'Neill in no way tried to conceal the fact that he was sleeping on the job. In fact, O'Neill himself was being viewed by the jail video surveillance system as he was sleeping, and O'Neill knew he was on camera.

70.     At approximately 10:07 a.m., a Correctional Officer who was walking by the B Range work station at which Geary O'Neil was napping actually bothered to look at the television monitor and saw Stevens hanging.

71.     At this point in time, Stevens had been hanging for half an hour, from 9:40 a.m. to 10:07 a.m..

72.     Correctional Officers went to Stevens' cell and cut him down. Stevens experienced conscious pain and suffering while hanging before he expired.

73.     They were far too late.

74.     Stevens was transported to local Uniontown Hospital wherein after a period of time he was subsequently pronounced dead due to asphyxiation by hanging.

75.     All three suicide attempts as well as the in-between periods during which Stevens bedsheet clearly hung from the top of his cell to the bottom were viewable on all 4 television monitors manned by Correctional Officers.

76.     Defendant Correctional Officer Barry Simon was initially stationed at the B Range work station, and failed to look at the television monitor. Had he, he would have seen Cade's suicide attempts. At a certain point in time, Simon went on a break and was relieved by Correctional Officer Geary O'Neil. O'Neil immediately commenced to taking a nap, despite knowing he had a duty to prevent Stevens from harming himself.

77.     Had either Simon, O'Neil, or the other 3 Correctional Officers manning the television monitors throughout the jail bothered to look at the television monitor, Stevens life would have been saved and his death prevented.

78.     Simon then proceeded to falsify entries on a watch log to cover up the fact that he failed to check on Stevens as required.

## COUNT I.
## THE PLAINTIFF VS. ALL DEFENDANTS.
## MULTIPLE CIVIL RIGHTS VIOLATIONS UNDER SECTION 1983; DELIBERATE INDIFFERENCE TO THE SERIOUS HEALTH NEEDS OF PRE-TRIAL DETAINEE CADE STEVENS.

79.     The above paragraphs are incorporated by reference as though set forth fully.

80.     Stevens had a serious health need: as learned during his medical evaluation, he was going through drug withdrawal and scored a 12 on the Defendants' point system, which per the Defendants' own policies meant that he was suicidal.

81.     The Defendants therefore were actually aware that Stevens had a serious health need, specifically, that he was suicidal and had a particular vulnerability to commit suicide.

82.     The Defendants also knew that there was a strong, substantial and excessive likelihood/risk that Stevens would attempt suicide in light of his scoring a 12 on the point system as well as being diagnosed as going through drug withdrawal.

83.     Defendants Carol Younkin, Brian Miller and Lou Krakowski, in their Official and Individual Capacities exhibited deliberate indifference, as detailed below, to the serious medical needs of Stevens. Stevens had a clearly-established right to be protected from the risk of suicide and these three Defendants knew that they were violating this constitutional right in failing to take reasonable steps to prevent his suicide by misclassifying Stevens as not suicidal. Younkin's recommendation that Stevens be classified as not suicidal was in no way a medical decision; rather, it was wholly based upon her knowing Stevens personally. Thus, Defendants Miller and Krakowski in no way at any time relied on the "medical" judgment of Younkin, and should have voted that Stevens be classified as suicidal. By failing to do so, these Defendants exhibited deliberate indifference to the known, substantial and obvious risk of a suicide attempt by Stevens, and disregarded that risk. They also failed to communicate to correctional officers that Stevens was suicidal and going through drug withdrawal.

84.     The Defendants exhibited deliberate indifference to Stevens' serious health needs repeatedly and at multiple junctures, to-wit, 3 suicide attempts as well as the 3 preparations for

the attempts and the 2 in-between periods. Thus, numerous occurrences and violations of Stevens' constitutional right to proper medical care occurred.

85.     The Defendants exhibited deliberate indifference to Stevens' serious medical needs by, inter alia, knowingly, intentionally and deliberately misclassifying him as not suicidal, failing to timely provide him with medication to address his drug withdrawal symptoms, failing to view the television monitors, by sleeping on the job, by failing to take reasonable steps to prevent his suicide, and by failing to communicate to the correctional officers that he was suicidal and going through drug withdrawal.

86.     With regard to Defendants Geary O'Neil and Barry Simon in both their Official and Individual Capacities, both were aware that there was a strong likelihood that Cade Stevens would attempt suicide.

87.     Despite the fact that none of the members of the Internal Classification Committee personally told either O'Neil or Simon that Cade had scored a 12 on the Defendants' own point-system and was also going through drug withdrawal, O'Neil and Simon learned through other employees of the Prison that Stevens had scored a 12 and was going through drug withdrawal and that this meant that there was a strong likelihood that Stevens would attempt suicide.

88.     Moreover, Stevens attempted suicide in the Prison prior to Saturday morning, of which both Geary and O'Neil were aware. Thus, they both were on notice that Stevens was suicidal.

89.     Therefore, O'Neil and Simon, in both their Official and Individual Capacities, were the cause of Stevens' death because both knew that Stevens was suicidal and had a particular vulnerability to commit suicide, yet failed to look at the television monitor at their work station on Saturday morning which would have revealed the 42 minute episode in which

Stevens engaged in 2 unsuccessful suicide attempts and then tragically succeeded on his 3rd

attempt. Had either O'Neil or Simon looked at the television monitor, his suicide would/could

have been prevented; their failure to do so disregarded an excessive risk that Stevens would

attempt suicide.

90.     The failure of O'Neil and Simon to view the television monitor located at their work

station despite knowing that Stevens was suicidal constituted deliberate indifference to the

serious medical need of Stevens; they purposefully disregarded the excessive risk that Stevens

would attempt suicide.

91.     It is also alleged alternatively as to Simon that if he did look at the monitor and/or viewed

Stevens and his cell personally, Simon saw Stevens' bedsheet hanging from the top of his cell,

and/or saw Stevens exhibit behaviors indicating he was contemplating a suicide attempt, yet

failed to act, despite knowing that Stevens was suicidal. This as well constituted deliberate

indifference to the serious medical needs of Stevens.

92.     Alternatively as to O'Neil, if, as of Saturday morning, he did not have any prior

knowledge that Stevens was suicidal, he cannot escape liability by claiming that because he was

asleep on the job, he did not know Stevens was suicidal. O'Neil had a duty at all times to provide

for the care, custody and control of all inmates – including Stevens.

93.     By sleeping on the job, O'Neil exhibited deliberate indifference to the serious medical

needs of all inmates, including Stevens; in particular, O'Neil knew that the cell Stevens was

lodged in was a cell in which suicidal inmates were placed; that is why there was a video camera

in that cell and that is why the footage from that cell appeared on the television monitor at his B

range work station, at all times.

15

94.     The violations of Cade Stevens' constitutional rights were the product of unconstitutional policies, practices and customs of Defendants Fayette County, Warden Larry Medlock in his Official Capacity as Warden of the Prison, Deputy Warden Brian Miller in his Official Capacity, and Prime Care Medical, Inc. as set forth in the following paragraphs. As such, municipal liability under <u>Monell</u> exists against all of these Defendants.

95.     The Defendants delineated in paragraph 92., above, failed to create/establish policies, procedures and protocols to ensure that the inmate medical evaluation findings, Inmate Classification Committee's classification recommendations, and what type of watch the inmates should have been placed on were communicated to the Correctional Officers. These Defendants knew that it was foreseeable that pre-trial detainess and inmates in the prison would and should be classified as suicidal, and that this information and all material information discussed at the Inmate Classification Committee meetings should be conveyed to the Correctional Officers - who would ultimately be responsible for monitoring the pre-trial detainees and inmates on the ranges. This failure caused the deliberate indifference exhibited by the Prime Care Medical Inc. staff and Correctional Officers' deliberate indifference (described earlier in this Complaint) on the day of Stevens suicide. Had the Correctional Officers been informed that Stevens was suicidal, that he was experiencing drug withdrawal, they would have been more attentive in watching the television monitors, and Stevens' death would have been prevented.

96.     Defendants Prime Care Medical, Inc., Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had a practice and custom of failing to communicate inmate medical evaluation findings and Inmate Classification Committee's recommendations as to how an inmate should be classified as well as which watch (i.e., a 15 minute

suicide watch) an inmate should be placed on to the Correctional Officers. These Defendants knew this practice and custom existed and also knew that an obvious risk existed that a pre-trial detainee and/or inmate at some point in time would attempt suicide. By permitting this custom and practice to exist, these Defendants exhibited deliberate indifference to the serious medical needs of pre-trial detainees and inmates, and their failure to address and eliminate this custom and practice actually caused the deliberate indifference on the day of Stevens' suicide; specifically, had the information that Stevens was suicidal been conveyed to the correctional officers, the officers would have viewed the monitors, one of Stevens three suicide attempts would have been viewed, and his life saved.

97.     Defendants Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had no policy or requirement that Correctional Officers actually had to look at the television monitors. These Defendants knew this and thus knew that an obvious risk existed that a pre-trial detainee and/or inmate at some point in time would attempt suicide. By having no policy or requirement in place, these Defendants exhibited deliberate indifference to the serious medical needs of pre-trial detainees and inmates, and this failure to create such an obviously necessary policy actually caused the deliberate indifference on the day of Stevens' suicide, specifically, had the correctional officers been required to view the monitors, one of Stevens three suicide attempts would have been viewed and his life saved.

98.     The Defendant correctional officers had a custom and practice of not looking at/viewing the television monitors; this they testified to at a Coroner's Inquest regarding Stevens' death. Defendants Fayette County, Warden Medlock and Deputy Warden Miller in their Official and Individual

17

Capacities knew this/were on notice of this, and thus knew that an obvious risk existed that a pre-trial detainee and/or inmate at some point in time would attempt suicide. By permitting this practice and custom to exist/acquiescing in this unconstitutional practice and custom, these Defendants exhibited deliberate indifference to the serious medical needs of pre-trial detainees and inmates, and this custom and practice actually caused the deliberate indifference on the day of Stevens' suicide, specifically, had the correctional officers been required to view the monitors, one of Stevens three suicide attempts would have been viewed and his life saved. See also Johnson vs. Medlock, 2:09-cv-234, Western District.

99.     Defendants Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, also had a custom and practice of failing to monitor/supervise correctional officers at their work stations, which created a culture in which Correctional Officers such as Geary O'Neil were completely comfortable in openly sleeping at his work station, despite knowing that they were being viewed, napping, on the Prison video surveillance system. By permitting this practice and custom to exist/acquiescing in this unconstitutional practice and custom, these Defendants exhibited deliberate indifference to the serious medical needs of pre-trial detainees and inmates; this custom and practice actually caused the deliberate indifference on the day of Stevens' suicide, specifically, had the correctional officers known that they were being appropriately monitored at their work stations, they would not have felt comfortable to nap, and one of Stevens three suicide attempts would have been viewed, and his life saved.

100.    Defendants Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had a custom and practice of tolerating and not disciplining Correctional Officers who slept at their work stations and/or failed to appropriately view the inmates

on the monitors. This custom and practice caused the constitutional deprivation on the day of Stevens death, for had the correctional officers known that they would be disciplined for sleeping at their work stations, they would not have felt comfortable to nap, and one of Stevens three suicide attempts would have been viewed on the monitors, and his life saved.

101.    Defendants Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had a custom and practice of failing to have the prison video surveillance system operational and working, see Lorraine Johnson vs. Fayette County, Docket Number 234 of 2007, Western District of Pennsylvania. These Defendants were aware of this, and permitting this custom and practice to exist caused the constitutional deprivation on the day of Stevens death, for the correctional officers explanation for not watching the monitors more closely was that the monitors frequently were not operational. Had the surveillance system been customarily operational, the correctional officers would have had reason to view the monitors more frequently on the day in question, and one of Stevens three suicide attempts would have been viewed on the monitors, and his life saved.

102.    Defendants Prime Care Medical, Inc., Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had a custom and practice of misclassifying inmates, of which custom and practice they were aware. This custom and practice resulted in the misclassification of Stevens, and was the moving force behind his death; had Stevens not been misclassified, at least one of his three suicide attempts would have been seen and appropriate intervention would have occurred.

103.    Defendants PrimeCare Medical, Inc., Fayette County, Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, failed to provide any/adequate

suicide prevention training to its correctional officers; inter alia, the training consisted of outdated information which has been described as "a joke" by their own Correctional Officers at a Coroner's Inquest held in response to Stevens' death. These Defendants knew that the training materials were outdated, ineffective, and viewed as a "joke" by their Correctional Officers, yet failed to take steps to update and/or improve the quality of the training. This constituted deliberate indifference to the obvious, known and foreseeable risk that an inmate or pre-trial detainee would at some point attempt suicide. This deliberate indifference by these Defendants caused the deliberate indifference exhibited by the Correctional Officers on the day of Stevens' suicide. Had these Defendants provided adequate suicide prevention training, Stevens death would have been prevented.

104.     Defendant Prime Care Medical, Inc. failed to train/provide adequate training to its own employees in the effects/risks of drug withdrawal. This constituted deliberate indifference to the obvious, known and foreseeable risk that an inmate or pre-trial detainee's intention to commit suicide would be misinterpreted as merely the effect of drug withdrawal. This deliberate indifference in failing to train/adequately train caused the deliberate indifference exhibited by Carol Younkin and Timmee Burnsworth, described earlier in this Complaint, on the day of Stevens' suicide. Had Prime Care Medical, Inc. provided training/adequate training, Stevens' death would have been prevented.

105.     Defendant Prime Care Medical, Inc. failed to provide any/appropriate training to Fayette County Correctional Officers in the effects/risks of drug withdrawal. This constituted deliberate indifference to the obvious, known and foreseeable risk that an inmate or pre-trial detainee's intention to commit suicide would be misinterpreted as merely the effects of drug withdrawal. This deliberate indifference in failing to train/adequately train caused the deliberate indifference exhibited by the Correctional Officers, described earlier in this Complaint, on the day of Stevens' suicide. Had Prime

Care Medical, Inc. provided training/adequate training to the Correctional Officers – those with the ultimate responsibility for monitoring the inmates and interceding during a suicide attempt - Stevens death would have been prevented.

106.    Defendants Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities further failed to create/establish any/adequate policies, procedures and protocols for addressing the medical needs of inmates who were going through drug withdrawal. This constituted deliberate indifference to the obvious, known and foreseeable risk that an inmate or pre-trial detainee's intention to commit suicide would be misinterpreted as merely the effect of drug withdrawal. This deliberate indifference in failing to establish any/adequate policies, procedures and protocols caused the deliberate indifference exhibited by the Correctional Officers and Prime Care Medical, Inc. staff described earlier in this Complaint, on the day of Stevens' suicide. Had these Defendants established adequate policies, procedures and protocols, Stevens death would have been prevented.

107.    Defendants Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities, had a custom and practice of failing to address the medical needs of inmates who were going through drug withdrawal, including a custom and practice of delaying and failing to give new commits who were experiencing drug withdrawal medicine in a timely manner. This resulted in the actions and inactions of Carol Younkin and Timmee Burnsworth, detailed earlier in this Complaint. Thus, this unconstitutional practice and custom was the direct cause of Stevens' tragic death.

108.    Defendants  Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities had a policy, practice and custom of

failing to staff its facility with medical personnel from 10:30 p.m. to 6:00 a.m., when most new commits are lodged in the jail and are most likely to begin going through drug withdrawal, are frightened and overwhelmed with being lodged in jail. See Johnson vs. Medlock, 2:09-cv-234, Western District. The failure to staff the facility during these crucial hours caused the constitutional deprivation of Stevens' rights on the day of his suicide.

109.    Defendants Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities had a custom and practice of exhibiting deliberate indifference to the serious health needs of pre-trial detainees and inmates, including but not limited to the deliberate indifference perpetrated against 48 year old Terry Johnson, who died in the prison on February 24, 2007 of peritonitis after being ignored by Correctional Officers and PCM employees which is the subject of a deliberate indifference lawsuit against these same Defendants at docket number 234 of 2007, Western District of Pennsylvania.

110.    Both municipal Defendants had a custom and practice of failing to conduct legitimate/genuine investigations into incidents of deliberate indifference to inmates' serious health needs. See Johnson vs. Medlock, 2:09-cv-234, Western District.

111.    Both municipal Defendants had a custom and practice of failing to appropriately discipline employees for exhibiting deliberate indifference to the serious health needs of pre-trial detainees and inmates on prior occasions. See Johnson vs. Medlock, 2:09-cv-234, Western District.

112.    Defendant Fayette County's Correctional Officers also have a custom and practice of falsifying watch logs to cover up correctional officers failure to actually check on/view inmates as required. Correctional Officer Bruce McCombie had been disciplined for falsifying documents on

or about September 9, 2009. Correctional Officer Joseph Yeagley had also been disciplined for falsifying documents on or about that same date.

113.   It was Defendants Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities  unconstitutional policies, lack of policies, customs and practices which caused the violations of Cade Stevens' constitutional rights.

114.   Had Defendants Prime Care Medical, Inc., Fayette County, and Warden Medlock and Deputy Warden Miller, in their Official and Individual Capacities not acted with deliberate indifference to the obvious and serious health needs of Stevens and provided proper medical attention, the 25 year old young man would not have died.

115.   As the direct and proximate result of the Defendants' multiple and repeated violations of Stevens's constitutional rights, the Plaintiff has sustained damages, including but not limited to the following:

      a.     The completely unnecessary death of the 25 year old Stevens;

      b.     Stevens's experiencing conscious pain and suffering prior to his expiration;

      c.     Stevens's loss of enjoyment of his life;

      d.     Stevens's increased earning potential;

      e.      Steven's future earnings;

      f.     all funeral expenses and related expenses;

      g.     and any/all other damages to which the Plaintiff may be entitled to, whether legal or equitable.

**WHEREFORE**, the Plaintiff demands judgment against these Defendants, jointly, severally, and individually in an amount to be determined by a jury after a trial by jury, compensatory damages, interest, costs, attorney fees and any/all other relief as this Court may

deem appropriate, whether legal or equitable, including the mandated training of Fayette County and medical personnel of PrimeCare Medical, Inc. so that such a situation never happens again.

## COUNT II.    SURVIVAL ACTION.

116.    The foregoing paragraphs are incorporated by reference as though set forth fully.

117.    The Plaintiffs bring this Survival Action under 20 Pa. Cons. Stat. Ann. § 3373 and 42 Pa. Cons. Stat. Ann § 8302.

118.    As a direct and proximate result of the Defendants' actions/inactions, decedent suffered and all of the Defendants are liable to Plaintiff for the following damages:

    (a)    decedent's pain and suffering between the time of his injuries and the time of death;

    (b)    decedent's total estimated future earnings less his estimated cost of personal maintenance;

    (c)    lost earnings capacity;

    (d)    decedent's loss of retirement and Social Security income;

    (e)    decedent's other financial losses suffered as a result of his death; and

    (f)    decedent's loss of the enjoyment of life; and

    (g)    any/all other damages to which the Plaintiff may be entitled to, whether legal or equitable, in a Survival Action.

**WHEREFORE**, the Plaintiffs demands judgment against these Defendants, jointly, severally, and individually in an amount to be determined by a jury after a trial by jury, compensatory damages, interest, attorney fees and any/all other relief as this Court may deem appropriate, whether legal or equitable, including the mandated training of Fayette County and

medical personnel of PrimeCare Medical, Inc. so that such a situation never happens again.


## COUNT III.
## WRONGFUL DEATH ACTION.

119.    The foregoing paragraphs are incorporated by reference as though set forth fully.

120.    The Plaintiffs bring this action pursuant to the Pennsylvania Wrongful Death Act,

42 Pa. Cons. Stat. Ann § 8301 and Pa. R.C. P. No. § 2202(a).

121.    The decedent did not bring an action for personal injuries during his lifetime, and

no other action for the death of the decedent has been commenced against the defendant.

122.    As a direct and proximate result of the Defendants' aforesaid acts, the Defendants are

liable and the Plaintiffs seek the following damages:

> (a) the funeral expenses for the decedent;

> (b) expenses of administration related to decedent's injuries; and

> (c) any/all other damages as are permissible for her to
>     recover in a wrongful death action.


**WHEREFORE,** the Plaintiffs demand judgment against all Defendants, jointly,

severally, and individually in an amount to be determined by a jury after a trial by jury,

compensatory damages, interest, costs, attorney fees and any/all other relief as this Court may

deem appropriate, whether legal or equitable, including the mandated training of Fayette County

and medical personnel of PrimeCare Medical, Inc. so that such a situation never happens again.

Respectfully submitted,

/s/ Noah Geary_____
Noah Geary, Esquire
Attorney for the Plaintiffs
Suite 225
Washington Trust Building
Washington, PA 15301
(724) 222-3788

February 29, 2012

**VERIFICATION TO SECOND AMENDED COMPLAINT.**

I, Shannon Ferencz, Administratrix of the Estate of Cade Stevens, and Shannon Ferencz, Individually, hereby verify that the facts and statements made within are true and correct to the best of my knowledge, information and belief. I understand that false statements herein made are subject to the penalties of 18 Pa.C.S.A. Section 4904, relating to unsworn falsification to authorities.

/s/ Shannon Ferencz
Shannon Ferencz, Individually

/s/ Shannon Ferencz, Administratrix of the Estate of Cade Stevens
Shannon Ferencz, Administratrix of the Estate of Cade Stevens

*Date: February 24, 2012*