IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHANNON FERENCZ,<br>*Administratrix of the Estate of Cade Stevens*,<br><br>Plaintiff,<br><br>v.<br><br>LARRY MEDLOCK,<br>BRIAN MILLER,<br>GEARY O'NEIL,<br>BARRY SIMON,<br>JOHN DOE ##1, 2, 3 AND 4,<br>PRIMECARE MEDICAL, INC.,<br>LOUIS KRUKOWSKY, and<br>FAYETTE COUNTY,<br>PENNSYLVANIA,<br>Defendants. | Civil Action No. 11 – 1130<br><br>District Judge Terrence F. McVerry<br>Chief Magistrate Judge Lisa Pupo Lenihan |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court are Objections filed by all parties (ECF Nos. 123, 124, 125 and 126) to the Report and Recommendation ("R&R") issued on May 15, 2014 by Chief Magistrate Judge Lisa P. Lenihan (ECF No. 120), which addressed the parties' cross-motions for summary judgment. Plaintiff has filed responses in opposition to the Objections filed by Defendants. The Objections are ripe for disposition. The standard of review is de novo.

Factual and Procedural Background

This case arises from a tragic situation, namely, the suicide death of Cade Stevens, a pretrial detainee at the Fayette County Prison on September 12, 2009. The R&R has thoroughly

1

set forth the factual record, including disputed matters, and that recitation is adopted herein.

Plaintiff Shannon Ferencz is the decedent's mother and the administratrix of his estate. Named as Defendants are Larry Medlock, the now-retired warden of Fayette County Prison; Brian Miller, the Deputy Warden in 2009; Corrections Officers Geary O'Neil and Barry Simon; Louis Krukowsky, a counselor at the prison; Fayette County; PrimeCare Medical Incorporated ("Primecare"), which was contracted by Fayette County to provide medical care to inmates; and Primecare nurse-employees Carol Younkin and Timmee Burnsworth. The Second Amended Complaint asserts the following claims: Count I encompasses multiple civil rights violations under 42 U.S.C. § 1983 for deliberate indifference to the serious health needs of Stevens[1]; Count II is a survival action under Pennsylvania state law; and Count III is a wrongful death action under Pennsylvania state law. On October 17, 2012, Chief Magistrate Judge Lenihan held that the claims against nurses Younkin and Burnsworth were untimely and dismissed each of them as parties to this case. On May 28, 2014, the "John Doe" Defendants were also dismissed from this case.

To briefly summarize, when viewed in the light most favorable to Plaintiff, the record reflects a series of events by which Stevens' death could allegedly have been prevented. At 8:30 a.m. on September 11, Nurse Younkin performed an initial interview and assessed Stevens as a "12" on the Intake Suicide Screening form. It is undisputed that according to prison and Primecare policy (and the face of the form itself), if the total screening score is 8 or more, the inmate must be placed on a suicide watch, which would trigger robust precautionary measures. The intake nurse does not have discretion to not place such an inmate on suicide watch. Only a

---

[1] This style of pleading makes resolution on summary judgment difficult, because numerous claims and legal theories, against various different Defendants, have been lumped into a single count of the complaint.

psychiatrist would have had authority to not place or remove an inmate from suicide watch. CSMF ¶ 35. Nevertheless, despite having knowledge of this policy, Nurse Younkin did not place Stevens on suicide watch.[2] Instead, Nurse Younkin placed Stevens on a less-stringent drug withdrawal watch and arranged with Dr. Delio to begin a heroin withdrawal treatment protocol.

At 12:30 p.m. that day, Nurse Younkin met with counselor Krukowsky and Deputy Warden Miller as members of the Inmate Classification Committee ("ICC") to determine where Stevens should be housed. The ICC would not have met if Stevens had been classified as suicidal in the initial screening by Younkin because he would have automatically been put on suicide watch. Nurse Younkin did not inform Krukowsky or Miller of Stevens' Intake Suicide Screening score. Stevens was assigned to Cell B-1 on B-Range, with no cell mate assigned. The cell was equipped with a video surveillance camera in service.

Younkin administered the first two doses of Stevens' heroin withdrawal medication. A factfinder could determine that Primecare Nurse Sabatula did not give Stevens his prescribed dose of the appropriate medication at bedtime that evening.[3] It is undisputed that Primecare Nurse Burnsworth did fail to administer the withdrawal medication to Stevens at 8:00 a.m. the next morning.[4]

The "movement sheet" which would have conveyed the enhanced observation needs regarding Stevens was apparently not fully distributed throughout the institution. Shift commander Mauro, control room officer Strickler, assigned floor officer Simon, and roving relief officer O'Neil all testified that they were not notified that Stevens had been placed on any

---

[2] Nurse Younkin personally knew Stevens, who was a friend of her son.
[3] Sabatula asserts that she administered the prescribed dose of medication at bedtime, but she allegedly does not appear on the video footage.
[4] Burnsworth's paperwork reflects that she had, in fact, given this medication. Her explanation, which the factfinder could disbelieve, was that she was "working ahead" on her paperwork.

type of special (suicide or drug withdrawal) watch. Although counselor Krukowsky was the person who usually distributed the movement sheet, it is unclear who was responsible for this task and apparently there was not a policy which ensured that such watch information was fully communicated to all necessary personnel.

Officer O'Neil had some limited, unremarkable interactions with Stevens during his regular shift on Friday, September 11. Officer Simon began his shift at 7:30 a.m. on Saturday, September 12. Simon testified that he did a head count upon commencement of his shift, and again visually observed Stevens at approximately 8:35-8:40 a.m. and 9:00 a.m. Officer Simon testified that at approximately 9:30 a.m., he could see Stevens continuing to lay on his bunk. At 9:32 a.m. (based on the video time stamp), Stevens began pacing and tied his bed sheet to the bars of his cell. At 9:33 a.m., Officer Simon left his chair and walked toward the control room area off-camera.[5] From 9:33 until 9:41 a.m., no officer was visibly on duty at the work station, which was located approximately 20 feet from Stevens' cell. At 9:34 a.m., Stevens tied the other end of the sheet around his neck and attempted to hang himself. After a few minutes, he climbed back down and laid back on his bunk. The sheet remained tied to the bars. From 9:37-9:39, Stevens made another suicide attempt. At 9:40 a.m., Stevens again tied the sheet around his neck. At 9:41 a.m., Officer Simon reappeared briefly and Officer O'Neil (assigned as a rover that day) appeared on camera to relieve Simon for a 15-minute break.[6] A jury could find that

---

[5] The police investigation report reflects that Simon made a floor inspection at 9:38 a.m. Simon was subsequently fired for falsification of this inspection report.

[6] Officer Simon did not return to the work area after his break until after the suicide was reported. However, he may have technically been on-post (but off-camera) if the jury finds that he was in the passageway and conversing with the corrections officer in the control room for 20-30 minutes. *See* Arbitration Opinion.

4

O'Neil propped his feet up on a chair and took a nap for the next 24 minutes.[7] At 9:41, Stevens hanged himself again. At 9:43, his body stopped moving. At 10:05 a.m., Officers Yatsko and Isler entered the work area; Yatsko saw Stevens on the monitor and alerted the control room; and the officers went into Stevens' cell and were unsuccessful in their attempt to resuscitate him.

All parties moved for summary judgment (ECF Nos. 73, 75, 78, 82). The R&R of Magistrate Judge Lenihan recommended that: (1) the summary judgment motion filed by Fayette County, counselor Krukowsky, Warden Medlock and Assistant Warden Miller be granted as to Counts 2 and 3 (Pennsylvania Wrongful Death and Survival claims) based on immunity under the Pennsylvania Political Subdivision Tort Claims Act, and denied in all other respects; (2) the motion for summary judgment filed by Primecare be granted in part and denied in part as to Counts 2 and 3 because Nurse Younkin's actions constituted "professional negligence" while the actions of Nurse Sabatula and Nurse Burnsworth constituted "ordinary negligence," and denied as to Count 1; (3) the summary judgment motion filed by Officers O'Neil and Simon be granted as to Counts 2 and 3 based on immunity under the Pennsylvania Political Subdivision Tort Claims Act, and denied in all other respects; and (4) Plaintiff's motion for summary judgment be denied. The instant Objections followed.

Legal Analysis

The Court appreciates the diligent and comprehensive efforts of the Magistrate Judge in this difficult case. The Court writes separately to explain its different conclusions on some of the

---

[7] Officer O'Neil denies that he slept. The Court must consider the facts in the light most favorable to the non-moving party.

dispositive legal issues and to provide further guidance for the remaining parties as to the issues to be determined at trial.

The Magistrate Judge correctly articulated the legal principles which govern prison suicide cases in the Third Circuit. Plaintiff's § 1983 claim is grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated into the Fourteenth Amendment. A plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*").

As explained in *Colburn II*, it is difficult to succeed on such claims because no state actor directly inflicted the harm. Thus, Plaintiff must establish that a defendant acted with "deliberate indifference" to a serious medical need, i.e., the inmate's particular vulnerability to suicide. This is a narrow and difficult standard. Simple negligence is not enough. *Id*. at 1024. Rather, a plaintiff must establish that prison officials knew or should have known that there was "a **strong likelihood**, rather than a mere possibility, that self-inflicted harm will occur." *Id.* (Emphasis added). To rise to a "strong likelihood," Plaintiff must establish that the risk of suicide was "so obvious that a lay person would easily recognize the necessity for preventative action." *Id*. at 1025. The risk must be based on individual symptoms rather than group characteristics. Courts are not permitted to infer, in hindsight, "from the prisoner's act of suicide itself that the prison officials were recklessly indifferent in their obligation to a take reasonable precautions to protect the safety of prisoners entrusted to their care." *Freedman v. City of Allentown*, 853 F.2d 1111,

6

1115 (3d Cir.1988). With that overview, the Court must review and address the § 1983 claims against the various Defendants.[8]

### A. Corrections Officers O'Neil and Simon

Plaintiff asserts two distinct theories as to why Officers O'Neil and Simon knew or should have known of Stevens' particular vulnerability to suicide: (1) the visible evidence of his prior unsuccessful suicide attempts that morning; and (2) that they had information about his drug withdrawal status, as communicated on the movement sheet. The Magistrate Judge recommended that these claims survive for trial. The Court agrees in part and disagrees in part.

The Court agrees with the Magistrate Judge that summary judgment is not appropriate on the "prior unsuccessful attempts" theory. A reasonable jury could conclude that O'Neil and/or Simon knew or should have known that Stevens had a strong likelihood of suicide based on the two unsuccessful attempts that morning. Their work station was within a few feet of Stevens' cell; the attempts took place over ten minutes; they were visible on the video monitor; and the sheet was left tied to the bars. A jury could find that the risk of suicide was "so obvious that a lay person would easily recognize the necessity for preventative action." In sum, a reasonable jury could conclude that O'Neil and/or Simon were deliberately indifferent to these attempts. Thus, this theory of liability under § 1983 should survive for trial.

On the other hand, Officers O'Neil and Simon are entitled to summary judgment on the "drug withdrawal" theory.[9] It is undisputed that Stevens was not placed on a suicide watch, so at

---

[8] These rights are well-established, such that the qualified immunity analysis parallels the underlying consideration of whether such rights were violated.
[9] The Magistrate Judge noted the officers' defense to this theory, R&R at 27 n.28, but did not fully analyze their legal argument.

most the officers were aware that he was on a drug withdrawal watch. The Court of Appeals for the Third Circuit has clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate indifference claim. *See Woloszyn v. County of Lawrence,* 396 F.3d 314, 322-23 (3d Cir. 2005) (finding no genuine issue of material fact as to whether a pre-trial detainee had a particular vulnerability to suicide, despite the detainee's intoxication, fluctuating mood, and reported distress about his family situation); *See also Colburn II*, 946 F.2d at 1026–27 (holding that intoxication does not create an issue of material fact regarding a particular risk of suicide). The record in this case is less alarming than that in *Wargo v. Schuylkill County*, 348 Fed. Appx. 756 (3d Cir. 2009), in which the detainee exhibited symptoms of drug addiction and withdrawal, attempted to take 10-12 oxycontin pills that he smuggled into the prison; cut open his mattress; and had a staple removed from his eye. Nevertheless, in *Wargo* the Court of Appeals affirmed summary judgment in favor of Defendants and explained that the detainee's interactions with prison officials (prior to the suicide attempt) did not demonstrate a strong likelihood of a particular vulnerability to suicide. Accordingly, officers O'Neal and Simon are entitled to summary judgment on the "drug withdrawal" theory.

It is undisputed that all of the Defendants, except Primecare, are immune from liability under Pennsylvania tort law. The Court concurs with the R&R that these Defendants are entitled to summary judgment on Counts 2 and 3. Accordingly, the motion for summary judgment filed by O'Neil and Simon will be granted in part and denied in part as to Count 1, and granted as to Counts 2 and 3. The only issue remaining for trial as to O'Neil and/or Simon is whether they were deliberately indifferent to the prior suicide attempts.

B. Deputy Warden Miller and Counselor Krukowsky

As an initial matter, it is undisputed that Deputy Warden Miller had no role in policy-making. Thus, the only theory of liability asserted against Miller and Krukowsky arises out of their participation on the Inmate Classification Committee ("ICC"). Plaintiff contends that their failure to ask Nurse Younkin about Stevens' score on the Intake Suicide Screening form rises to the level of "deliberate indifference." The Magistrate Judge recommended that this claim proceed to trial. The Court concludes that Miller and Krukowsky are entitled to summary judgment.

It is undisputed that pursuant to Primecare and prison policy, if the initial suicide screening results in a score of 8 or more, the inmate must be placed on suicide watch. In accordance with this policy, placement on suicide watch is not discretionary. Thus, in Stevens' case, the ICC should never have met. Nurse Younkin acted in violation of the policy. It is also undisputed that Nurse Younkin, the third member of the ICC, did not tell Miller or Krukowsky that she had failed to follow this policy or that Stevens actually scored "12" on the Intake Suicide Screening form. To the contrary, Younkin told Miller and Krukowsky that she was personally acquainted with Stevens and that he denied being suicidal. There is no evidence in the record by which a reasonable jury could conclude that Miller or Krukowsky knew or should have known of a strong likelihood that Stevens had a particular vulnerability to suicide. Nurse Younkin failed to share that information. Nor is there any evidence in the record by which a reasonable jury could conclude that Miller and/or Krukowsky should have known that Younkin had violated the

suicide-screening policy. Accordingly, Miller and Krukowsky[10] cannot be held to have acted with deliberate indifference and are entitled to summary judgment on all counts. They will be dismissed as parties to this action.

C. Fayette County and Primecare – Municipal Liability

The Second Amended Complaint asserts a number of theories of municipal liability against Fayette County and/or its medical contractor Primecare based on alleged unconstitutional policies and practices. Although the Magistrate Judge commented that not all of these theories were meritorious, the R&R recommended that summary judgment be denied on these claims. To provide for a more orderly and focused trial, the Court will clarify the parameters of the claim(s) remaining for trial.

The R&R correctly set forth the legal principles which govern municipal liability. To summarize, Plaintiff must establish that the alleged deprivation of Stevens' constitutional rights was caused by an official government policy or custom. *Galarza v. Szalczyk,* 745 F.3d 634, 639 (3d Cir. 2014). Plaintiff must also show that the decision-maker(s) had notice that a constitutional violation could occur and acted with deliberate indifference to this risk, such that the municipality was the "moving force" behind the injury alleged. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). An alleged failure to adequately train municipal employees can ordinarily be considered deliberate indifference only when the failure has caused a pattern of violations. *Id*. However, a plaintiff may also succeed by showing that a violation of federal rights may be a "highly predictable consequence of a failure to equip law enforcement officers

---

[10] For the reasons set forth above, even if Krukowsky failed to deliver the movement sheet, he cannot be held liable for deliberately disregarding a risk of suicide based on his knowledge of Stevens' drug withdrawal status. Stevens told Krukowsky that he was not suicidal.

with specific tools to handle recurring situations." *Id*. (citing *Board of County Comm. of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)). For example, in *Berg* the Court held that the County's failure to double-check to prevent typographical errors on a warrant led to an obvious risk of an unlawful arrest of the wrong person.

Unfortunately, the risk that an inmate may attempt to commit suicide in prison is a "recurring situation." Indeed, the prison had a suicide screening protocol in place. However, the evidentiary record reflects that the prison and Primecare apparently had no policy in place to ensure that the results of that screening (i.e., placement on suicide watch and/or drug withdrawal watch) were fully communicated to all relevant personnel, including the floor officers responsible for conducting such watches. Apparently, it was counselor Krukowsky's usual "practice" to distribute the movement sheet which contained this information, but it is unclear who -- if anyone -- was ultimately responsible for this essential task. In this case, numerous officers, including the control room and floor officers, testified that they were not notified that Stevens had been placed on any type of special watch. Obviously, a failure to communicate that an inmate was to be on suicide watch would frustrate efforts to prevent that inmate's suicide.

The Court will not countenance Defendants' citation to HIPAA as a justification for their refusal to fully communicate Stevens' risk of suicide.[11] As the Magistrate Judge aptly explained, HIPAA contains an exception which specifically permits use of such medical information by correctional institutions to protect the health and safety of inmates. R&R at 39-41; 45 C.F.R. § 164.512(k)(5).

---

[11] The Court does not regard the failure to share medical records as a distinct theory of municipal liability. Rather, it is one aspect of the broader alleged policy failure to ensure that all special watch needs were to be fully communicated.

The Court concludes that this is the only theory of municipal liability which remains for trial. The record does not support deliberate indifference by the municipal Defendants based on, inter alia, the alleged lack of a policy which required officers to actually look at the video screens[12]; the alleged failure to monitor officers at their work stations; the alleged failure to have the video system operational; the alleged practice of misclassifying inmates; the alleged failures in policy regarding administration of medications; the alleged failures to train; or the alleged errors raised in the *Johnson v. Medlock* case. *See generally* Second Amended Complaint. Indeed, Plaintiff has not pursued most of these theories. Each of these theories fails due to a lack of evidentiary support and/or the lack of the requisite highly predictable causal link to Stevens' suicide necessary to establish deliberate indifference.

In summary, the motion for summary judgment as to municipal liability will be denied in part, based on the alleged lack of a policy to communicate special watch needs, and granted in all other respects.

D. Warden Medlock – Supervisory Liability

To hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created;

---

[12] The video screens were prominently placed, and it was not unreasonable to assume that even minimally attentive officers would at least glance at them. Indeed, the video footage reflects that Officer Yatsko noticed Stevens immediately upon entering the work area and looking at the monitor. There is no evidence of a pattern of guards ignoring the video monitors, such that the need for a specific policy should have been readily apparent.

(3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001).

For the reasons set forth above, the Court has concluded that the prison's policy (or lack thereof) for ensuring full communication of inmate watch information may constitute deliberate indifference. Because Warden Medlock was allegedly responsible for prison policies, he may be held liable in his supervisory policymaking role, even though he had no personal knowledge or involvement in the actual events surrounding the suicide. *See, e.g.*, *Sparks v. Susquehanna County*, 2009 WL 922489 at *8-10 (M.D. Pa. 2009). All other claims against Warden Medlock will be dismissed.

E.  Primecare – Vicarious Liability for Negligence

At Counts 2 and 3, Plaintiff asserts that Primecare is vicariously liable for the negligence of its nurse-employees Younkin, Sabatula and Burnsworth. Primecare does not dispute its status as an employer. Instead, it argues that the allegations of misconduct constitute "professional negligence" for which Plaintiff failed to submit a certificate of merit pursuant to Pa. R.C.P. 1042.3. The Magistrate Judge concluded that the actions of nurses Sabatula and Burnsworth constituted "ordinary negligence" such that they survive for trial, but that the actions of Nurse Younkin constituted "professional negligence" such that they are procedurally barred. Although the Pennsylvania law which delineates these theories is less than clear, the Court concludes that the actions of all three nurses constitute ordinary negligence.

The "certificate of merit" requirement in Rule 1042.3 was intended to weed out frivolous claims which allege that medical and other professionals deviated from acceptable professional standards of care. But Rule 1042.3 was not intended to be a procedural trap to strike down

13

potentially meritorious claims sounding in ordinary negligence. *Ditch v. Waynesboro Hospital*, 17 A.3d 310, 318-19 (Pa. 2011) (Todd, J., dissenting). In *Ditch*, Justice Todd urged the Pennsylvania Supreme Court to address the boundary between ordinary negligence and professional negligence in the medical context. *Id*. at 316-17.

The distinction between professional and ordinary negligence is not based on the identity of the defendant, but upon the nature of the alleged negligent conduct. "[N]ot every act by a professional or his or her subordinates involves professional standards or judgments. Some simply require common sense." *Id*. at 319. Thus, in *Merlini v. Gallitzin Water Authority*, 980 A.2d 502, 506-08 (Pa. 2009), the Pennsylvania Supreme Court held that although the negligence claim was brought against a professional engineer in the context of his work performance, the claim constituted ordinary negligence because the alleged misconduct (installing a water line without a right-of-way) did not involve professional judgment beyond the scope of common sense. Similarly, in *Balter v. United States*, 2014 WL 1365905 at *25 (M.D. Pa. April 7, 2014), the Court recently held that an inmate's claim against a prison medical provider sounded in ordinary negligence rather than medical malpractice. As the Court explained, the claim did not involve the exercise of medical judgment, but instead alleged administrative errors (failures to schedule a followup appointment) which were within the realm of common knowledge.

Another way to articulate the applicable test is whether the actions complained of involve technical complexity or esoteric issues involving medical judgment beyond the realm of common knowledge and experience, or are matters of nonmedical, administrative, ministerial, or routine service, which a jury is competent to determine. *Ditch*, 17 A.3d at 318. In *Merlini*, the Pennsylvania Supreme Court explained: "the most distinguishing feature of professional

malpractice is the need for expert testimony to clarify complex issues for a jury of laypersons." 980 A.2d at 506.

Applying these principles to the facts of this case, the Court concludes that the alleged conduct of all three nurses constitutes ordinary negligence. The Court adopts the R&R as to the alleged failure of nurses Sabatula and Burnsworth to administer Stevens' drug withdrawal medication. The nurses had no discretion to refuse to provide those doses. By the same token, Nurse Younkin had no discretion in failing to put Stevens on a suicide watch. Importantly, her professional judgment in administering the intake suicide examination is <u>not</u> at issue – it is undisputed that Younkins gave Stevens a score of 12. The only alleged negligence is her failure to follow the mandatory Primecare and prison policy when a score of 12 is recorded. Nurse Younkin's conduct did not involve medical judgment – indeed, the policy was designed to <u>eliminate</u> any professional discretion by the intake nurse and to make placement on suicide watch mandatory.[13] No expert testimony is necessary. It is within the realm of common sense. Accordingly, a Rule 1042.3 certificate of merit is not required and Primecare may be held vicariously liable for the alleged negligent actions or inactions of all three nurses. In summary, Primecare's motion for summary judgment on Counts 2 and 3 will be denied.

Plaintiff has objected to the R&R and seeks judgment in her favor on these claims. The Court concludes that trial is necessary. In considering summary judgment in favor of Plaintiff, the Court must construe the evidentiary record in the light most favorable to Defendants. For example, Nurse Sabatula testified that she did, in fact, administer the bedtime dose of medication

---

[13] Only a psychiatrist had authority to remove an inmate from suicide watch. CSMF ¶ 35. Younkin testified that her refusal to follow the policy was based on her personal knowledge of Stevens, who was a friend of Younkin's son, as well as her general disagreement with the number of points assessed on the screening form for drug withdrawal symptoms.

and Nurse Burnsworth testified that she would have given the morning dose, but for the suicide. There are also questions of causation. In sum, the Court agrees with the R&R and Plaintiff's motion for summary judgment will be denied.

Conclusion

In summary, for the reasons set forth above, the Court concludes that only the following claims remain outstanding for resolution at trial: (1) § 1983 against officers O'Neil and Simon for deliberate indifference to the prior suicide attempts; (2) § 1983 municipal liability against Fayette County and Primecare for lack of a policy to communicate special watch needs; (3) § 1983 claim against Warden Medlock for lack of a policy to communicate special watch needs; and (4) Pennsylvania tort liability claims against Primecare for the alleged ordinary negligence of nurses Younkin, Sabatula and Burnsworth. Defendants' motions for summary judgment will be granted in all other respects. Plaintiff's motion for summary judgment will be denied. Defendants Miller and Krukowsky will be dismissed from the case and the caption will be modified accordingly.

An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHANNON FERENCZ, *Administratrix of the Estate of Cade Stevens*, <br><br>Plaintiff,<br><br>v.<br><br>LARRY MEDLOCK,<br>BRIAN MILLER,<br>GEARY O'NEIL,<br>BARRY SIMON,<br>JOHN DOE ##1, 2, 3 AND 4,<br>PRIMECARE MEDICAL, INC.,<br>LOUIS KRUKOWSKY, and<br>FAYETTE COUNTY,<br>PENNSYLVANIA,<br>Defendants. | Civil Action No. 11 – 1130<br><br>District Judge Terrence F. McVerry<br>Chief Magistrate Judge Lisa Pupo Lenihan |

## ORDER OF COURT

AND NOW, this 8th day of July, 2014, for the reasons set forth in the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Objections to the Report and Recommendation issued on May 15, 2014 by Chief Magistrate Judge Lisa P. Lenihan filed by Fayette County, Krukowsky, Medlock and Miller (ECF No. 123) are GRANTED IN PART AND DENIED IN PART; the Objections filed by Primecare Medical Incorporated (ECF No. 124) are GRANTED IN PART AND DENIED IN PART; the Objections filed by officers O'Neil and Simon (ECF No. 125) are GRANTED IN PART AND DENIED IN PART; and the Objections filed by Plaintiff (ECF No. 126) are DENIED.

17

The MOTION FOR SUMMARY JUDGMENT filed by Fayette County, Krukowsky, Medlock and Miller (ECF No. 73) is **DENIED IN PART** at Count 1 as to Fayette County and Medlock regarding the prison policy for communicating special watch needs, and **GRANTED** in all other respects, and Krukowsky and Miller are hereby dismissed as parties;

The MOTION FOR SUMMARY JUDGMENT filed by Primecare (ECF No. 75) is **DENIED IN PART** at Count 1 regarding the prison policy for communicating special watch needs, **DENIED IN PART** at Counts 2 and 3 regarding the negligence of nurses Younkin, Sabatula and Burnsworth, and **GRANTED** in all other respects;

The MOTION FOR SUMMARY JUDGMENT filed by officers O'Neil and Simon (ECF No. 78) is **DENIED IN PART** at Count 1 regarding the prior suicide attempts, and **GRANTED** in all other respects; and

The MOTION FOR SUMMARY JUDGMENT filed by Plaintiff (ECF No. 82) is **DENIED**.

**IT IS FURTHER ORDERED** that the Report and Recommendation dated May 15, 2013 (ECF No. 120), is **ADOPTED** as the opinion of the Court except as modified herein.

The caption is hereby amended as follows:

| | | |
|---|---|---|
| SHANNON FERENCZ, *Administratrix of the Estate of Cade Stevens*, | ) ) ) ) | Civil Action No. 11 – 1130 |
| Plaintiff, | ) ) | District Judge Terrence F. McVerry Chief Magistrate Judge Lisa Pupo Lenihan |
| v. | ) ) | |
| LARRY MEDLOCK, GEARY O'NEIL, BARRY SIMON, FAYETTE COUNTY and PRIMECARE MEDICAL, INC., Defendants. | ) ) ) ) ) | |

By the Court:

s/Terrence F. McVerry
United States District Judge

cc: Counsel of Record
(*Via ECF Electronic Mail*)